## White Estate

*William Carson Bodine*, for accountant.

*William White, Jr.*, for petitioner.

*F. Raymond Heuges*, guardian and trustee ad litem.

SHOYER, J., June 30, 1961. This trust arises under the will and codicil of Katherine Elizabeth White, who died August 26, 1926, whereby she gave one thousand shares of the capital stock of the S. S. White Dental Manufacturing Company, or if said stock shall have been previously sold, then in lieu thereof the proceeds, to her trustees, in trust, to pay over the income to her husband, Samuel S. White, Jr., for life, and after his death to invest and reinvest the income until her granddaughter, Katherine May White, shall have attained age 23 years, and thereafter to pay the said granddaughter the income from the said trust fund and from its accumulations, during her life, and upon her death upon such terms and conditions as Katherine May White may by her last will direct, limit and appoint, provided that "Should the said Katherine May White die intestate or before she reaches the age of twenty-one, then I direct that the principal of the said trust fund shall be distributed in accordance with the Intestate Laws of the Commonwealth of Pennsylvania."

The fund being accounted for was awarded by my adjudication dated February 24, 1955, to Girard Trust Corn Exchange Bank and Richard Stockton White, testamentary trustees, in trust, for the benefit of testa-

trix' granddaughter, Katherine White Illoway. The account is stated by the corporate trustee and the executors of the estate of Richard Stockton White, deceased, cotrustee, he having died July 18, 1959.

Samuel S. White, Jr., husband of decedent, died April 15, 1936.

Katherine White Illoway is living, and the trust continues for her benefit. Annexed hereto is her waiver of an accounting of income for the period prior to that stated in the account.

Katherine White Illoway has three children, namely: Peter Stockton Illoway, L. Stockton Illoway and N. Katherine Illoway, each of whom is a minor.

The statement of proposed distribution recites that J. William White, 2nd, Samuel Stockton White, 4th, and Robert Stockton White, brothers of the life tenant, are all living and are possible contingent remaindermen. J. William White, 2nd, aforementioned, has two children, Randolph Stockton White and James William White, 3rd, both of whom are minors. Robert Stockton White, grandson of testatrix, has one child, Robert David White, a minor. The aforementioned nephews of the life tenant are also contingent remaindermen. The life tenant also has a sister, Virginia White, who is an incompetent, and Girard Trust Corn Exchange Bank and Samuel Stockton White are guardians of her estate, by virtue of decree of the Orphans' Court of Chester County dated January 28, 1959. She is also a possible contingent remainderman.

By decree dated January 28, 1960, the auditing judge, pursuant to a petition filed by the accountants, appointed F. Raymond Heuges, Esq., guardian ad litem for the aforementioned minors and trustee ad litem for persons now unborn or unascertained who may have an interest in the trust.

Mr. Heuges has filed his report. He therein reviews and approves accountants' allocation from principal to income, under the Pennsylvania rule of apportionment, of 166-45/100 shares of the S. S. White Dental Manufacturing Company, which was a part of that Company's four percent stock dividend paid November 21, 1958, as a result of which this trust received a total of 176 shares on account of the 4,400 shares then held by the trust, as reflected on pages 3 and 6 of the account. He also approves accountants' proposal to allocate from principal to income 79.49 shares of the same company's two per cent stock dividend paid to stockholders of record on October 31, 1960, as a result of which the trust received 91.52 shares of S. S. White Dental Manufacturing Company stock. The corporate accountant requests an allowance of $25 to itself, out of income, for preparing the 1960 stock dividend apportionment calculation. The apportionments referred to and the charge of $25 are approved.

### Question Requiring Adjudication

Does Katherine May White Illoway, the life tenant, have an absolute fee estate? May the trust now be terminated upon the petition filed by Katherine May White praying for an award of the trust corpus to herself, absolutely?

In her petition to terminate the trust, she avers that she attained age 23 years on March 1, 1937; that "no purpose of the trust under the will of Katherine Elizabeth White remains unaccomplished so as to preclude termination . . ."; that she believes "that the gift in default of appointment in the trust under will of Katherine Elizabeth White refers to the heirs of Katherine White Illoway."

Counsel for the surviving trustee and the guardian-trustee ad litem in their separate memorandums of law resist the life tenant's plea for termination. They

each contend that the gift in default of appointment is to the heirs of *testatrix*, not to the life tenant's heirs, and, in any event, testatrix' intentions as expressed in her will *have not been fully accomplished.* S. Stockton White, 4th, life tenant's brother, agrees with the position taken by the trustee (see his letter dated February 17, 1960).

Counsel for petitioner, the trustee and the guardian-trustee ad litem have entered into a stipulation of facts. The stipulation recites that testatrix died August 26, 1926, leaving a will dated November 24, 1923, and a codicil dated March 4, 1926; that she was survived by her husband, S. S. White, Jr., her only child, Richard Stockton White, and his five children: Katherine May White, now Mrs. Illoway, petitioner, who was then 12 years of age; J. William White, age nine; Samuel Stockton White, age six; Robert Stockton White, age three, and Virginia White, two months of age; that Mrs. White's husband, Samuel S. White, Jr., was a son of S. S. White, who founded the S. S. White Dental Company in 1844; that Samuel S. White, Jr., was president of the company from 1912 to 1915, and a member of its board of directors until his death on April 15, 1936, at which time he owned 7,585 shares of the company's stock, and his estate was inventoried at his death at $547,254.81.

The life tenant's application to terminate the trust must be, and it is hereby, denied for the reasons stated below.

Recently, in Drexel Estate, 19 D. & C. 2d 735 (1959), this court reiterated some clearly settled rules necessary to be applied in analyzing a will. We there stated, pages 737, 738:

"In Weaver Estate, 390 Pa. 128, 131, quoting with approval from McFadden Estate, 381 Pa. 464, 467, and Lifter Estate, 377 Pa. 227, 231, the court said:

' " 'The intention of the testator is the pole star in the interpretation of every will and that intention must be ascertained from a consideration of the *entire will, including its scheme of distribution as well as its language,* together with all the surrounding and attendant circumstances: [citing cases].' " '

" 'In construing a will it is the court's first duty to examine the will and, if possible, ascertain its meaning without reference to canons of construction': Walker Estate, 376 Pa. 16, 18.

" ' " When the intention of the testator can be ascertained by an examination of his entire will . . . 'technical rules or canons of construction are unnecessary.' . . .

" ' " ' " 'It is only where the intent is uncertain or the language ambiguous that such canons should be resorted to' " ' " ' ": Richley Estate, 394 Pa. 188, 193."

It is apparent from the will and codicil that testatrix knew how to make an absolute gift, as she did when in her will she gave her residuary estate to her son absolutely, and by her codicil made the numerous bequests to her husband, to her only child, to her son's four children then living and to his child yet unborn, and to other designated persons. On the other hand, the gift of the S. S. White stock, or its proceeds, to her trustees expressly provided that the income therefrom was to be paid, first, to her husband, during his lifetime, and upon his death to her granddaughter, Katherine May White, "for and during the *full term of her natural life* . . ." (Italics supplied). As will be pointed out, this trust is plainly active. While, during the lifetime of settlor's husband, the trustees' discretion as to the sale, exchange or voting the stock was subject to the control of testatrix' husband, this control terminated upon his death. Thereafter, trustees had full power to alter, vary and change investments,

but were restricted to "'Legal Securities" in making investments. In default of appointment by Katherine of the remainder, the "said Trust shall be distributed in accordance with the Intestate Laws of Pennsylvania."

In Earp's Appeal, 75 Pa. 119 (1874), testator gave his residuary estate to his trustees to pay one-fourth of the income to each of three children "during their natural lives respectively," and upon the death of a child to distribute one-fourth of the corpus as such child shall appoint by will and, in default of appointment, the one-fourth share of principal to go ". . . unto such person or persons as by the laws of the Commonwealth of Pennsylvania would have been entitled to the same if the deceased child had been legally seised of the said premises, in his or her own right, and died intestate." The three children filed a bill to terminate the trusts on the ground they were inoperative. The Supreme Court affirmed the lower court's dismissal of the bill. Chief Justice Agnew said, pages 122, 123:

"Why should the law be inimical to those special or active trusts which enable a testator or other donor to provide for the necessities of a family, and the changes made by death, misfortune or accident, or to enable him to preserve his property for the objects of his bounty, when not contrary to any well defined public policy?

"The right of property is one protected by the bill of rights; and the right to regulate its use within reasonable limits, is a just corollary from the right itself. Trusts supply the means of carrying out family arrangements, and of breaking the force of the blow death deals against the head. They furnish a protection against improvidence, indiscretion, inexperience, imbecility, misfortune, and even vice, upholding the wishes of parents and friends, and inspiring even the

dying with comfort. They are contrary to no principle of justice, wisdom or morality, and therefore demand our confidence and support in proper cases. Hence, when a special trust within these limits is clearly raised by the imposition of active duties on the trustee, or for purposes making it necessary to preserve the estate intended to be given, the will of the donor gives efficacy to the trust. *Voluntas donatoris in charta sui manifeste expressa observanda.*"

And at pages 123-24:

"In this will there are four things to be noticed, distinguishing it clearly from Yarnall's Appeal [20 P.F. Smith 335] and Ogden's Appeal [20 P.F. Smith 507]. The *corpus* of the estate is fully and distinctly invested in the trustees, and put under their control. The bequests to the three children, Hannah, Annie and George, are only of the *income*. Their estates in the income are only for *life*, and without regard to *coverture*. The *principal* is devised and bequeathed to the persons who would be entitled to it under the intestate law. Here is plainly an active operative trust, following a manifest intention essential to carry it into effect, by holding the *corpus* of the property itself, in the hands of the trustee, during the lives of the testator's own children, irrespective of any purpose in regard to coverture, to enable them to receive and apply the income only to these children, and then to carry over the principal or *corpus* to their issue at their deaths. Without maintaining the trust, this plain and lawful intent cannot be carried into execution."

To the same effect is Rech's Estate, 18 D. & C. 466, decided by this court in 1933. See also the very careful analysis of the problem of termination of testamentary trusts in Pennsylvania by our colleague, Judge Bolger, in Miller Estate, no. 210, January term, 1901, adjudication filed July 16, 1937, not reported.

Upon this review of the authorities, my conclusion must be that the rule laid down in Earp is controlling.

Another fatal reason precluding the termination of the trust at this time is the absence of consent of *all* beneficiaries.

In Bowers' Trust Estate, 346 Pa. 85 (1943), Mr. Justice Stern, later Chief Justice, said, pages 87-88:

"If all the parties who are or may be beneficially interested in a trust are in existence and sui juris, if there is no ultimate purpose of any kind requiring its continuance, and if all the beneficiaries consent, a court of equity will decree its termination; of course, if there are contingent remaindermen not in existence or not ascertained, the trust cannot be terminated since it is then impossible to obtain the consent of all possible interests."

It is inopportune to conjecture now who, in the event of the death of the life tenant without having exercised her power of appointment, would be entitled to the principal in accordance with our intestate laws. The gift of the remainder, in default of appointment, is ambiguous: Did testatrix intend the remainder to go to her own heirs, or to the heirs of the life tenant, and are the heirs of either to be determined as of the death of testatrix or the life tenant?

In Abel v. Abel, 201 Pa. 543 (1902), testator gave one of his two sons the possession of certain real property for life and provided "at his death the property to be sold for the benefit of the heirs." The basic question in the ejectment proceeding was whether "the heirs" were those of testator or of the life tenant. The Supreme Court affirmed the holding of the lower court, holding "the heirs" were those of testator. The Supreme Court stated, page 545:

"We think it is clear that the testator intended that his son William was not to have an estate in fee, but

was to have a life estate only, in the property. And that when the testator directed that at the death of his son William, the property should be sold for the benefit of 'the heirs,' he meant his own heirs.

"This view seems to be in harmony with that taken in Baskin's Appeal, 3 Pa. 304, where the expression used, was 'all the heirs.'

"The construction for which the appellant contends cannot therefore be maintained. If it were, the effect would be to exclude the testator's son Charles, from any share in the estate. We do not find in the will any clear evidence of any such intention, and nothing less than express devise, or necessary implication will exclude an heir. Where the meaning of a devise is uncertain, the law will adhere as closely as possible to the general rules of inheritance, and whosoever claims against the law of descent must show a satisfactory written title: Grim's App., 89 Pa. 335."

The rule of construction enacted by our Act of June 29, 1923, P. L. 914, in pertinent part, provides:

". . . when, . . . by . . . will . . . property, . . . shall be . . . devised, or bequeathed, either directly or in trust, for the use and benefit of any person, . . . for years or for life . . . and which shall provide therein that, upon the termination of the estate for . . . life . . . the remainder over shall vest in the . . . testator's heirs or next of kin or the persons thereunto entitled under the intestate laws, . . . the same shall be construed as meaning the person or persons thereunto entitled at the time of the termination of the estate for years or for life . . . under the intestate laws of the Commonwealth as they shall exist at the time of such termination . . ."

Be that as it may, petitioner here does not have the consent to termination by the parties who may be interested in the remainder. On the contrary, the guardian-trustee ad litem, in his report, and the life tenant's

brother, S. Stockton White, 4th, by letter referred to above, object to the termination.

Horner Estate, 5 Fiduc. Rep. 648, cited by petitioner in support of her application, is inapposite. In that case, the auditing judge held:

"Where there is a gift of income for life plus a gift to the life tenant of a testamentary power of appointment plus a gift to the *life tenant's heirs* in default of appointment, the life tenant is the sole party in interest and may, in the absence of a spendthrift clause, terminate the trust and capture the principal. . . ." (Italics supplied.)

Unmistakably, in the instant matter there is no express gift of the remainder to the *"life tenant's heirs."* See also Rech's Estate, supra, page 469.

The objections to the application to terminate the trust must be sustained. The application to terminate the trust is refused.

The guardian-trustee ad litem in his supplemental report recites his investigation and approval of the account. His report and supplement thereto are approved.

Except as noted above, all parties in interest are stated to be sui juris and to have had notice of the audit and of the questions involved.

There was no objection to the account which shows a balance of principal of $103,093.36, which, composed as indicated in the account, is awarded as follows:

To F. Raymond Heuges, Esq., reasonable compensation as guardian-trustee ad litem in such amount as may be agreed to by the parties;

To income, 79.49 shares S. S. White Dental Manufacturing Co., less $25 compensation allowed accountant for preparing apportionment calculation.

And the balance then remaining to Girard Trust Corn Exchange Bank, surviving trustee, in further

trust under the will of Katherine Elizabeth White, deceased.

The account shows a balance of income of $9,366.99 which, composed as indicated in the account, together with the stock apportioned from principal, as above, and income to date of distribution, subject to distribution thereof heretofore properly made, is awarded to Katherine White Illoway.

Leave is hereby granted the accountants to execute and deliver all necessary transfers and assignments.

And now, June 30, 1961, the account is confirmed nisi.